597 P.2d 745

ORTEGA, SNEAD, DIXON & HANNA, a partnership, Plaintiff-Appellee,

v.

Joseph A. GENNITTI, Pecos Land and Cattle Corporation, Orchid Island Hotels, Inc. and Josephine Gennitti, Defendants-Appellees,

Louis Meneghin and Jeanette Meneghin, his wife, Cross-Defendants-Appellees,

Bill Frost and Leta M. Omta, personal representative for John W. Omta, Deceased, Defendants-Appellants.

No. 11418.

Supreme Court of New Mexico.

July 26, 1979.

Solomon, Roth & Van Amberg, Charles S. Solomon, Santa Fe, for defendants-appellants.

Matias A. Zamora, Santa Fe, Michael D. Bustamante, Albuquerque, Richard F. Rowley, II, Clovis, for defendants-appellees.

## OPINION

PAYNE, Justice.

On May 15, 1979 an opinion in the above case was handed down by this Court. A motion for rehearing was filed by the personal representative of one of the defendants, John W. Omta, deceased. The motion for rehearing was granted in order to reconsider our original opinion. Several factual inaccuracies in the first opinion were brought to light on rehearing. Although we are satisfied that these matters do not change the soundness of the result we originally reached, we are hereby withdrawing the opinion of May 15, 1979 in order to correct the inaccuracies.

Plaintiff, Ortega, Snead, Dixon & Hanna, a partnership engaged in the practice of law, brought suit in Guadalupe County seeking judgment on an open account and foreclosure of a mortgage. A default judgment was entered against four of the eight named defendants, Joseph and Josephine Gennitti, Pecos Land and Cattle Corporation, and Orchid Island Hotels, Inc. No appeal was taken from this default judgment. The remaining four defendants, Louis and Jeanette Meneghin, and Bill Frost and John Omta, respectively, sought by counterclaim and cross-claim to quiet title to the subject property. The trial court dismissed the claim of Frost and Omta, and quieted title in the Meneghins subject to the mortgage lien in favor of Ortega. Omta appeals.[1]

The transactions which gave rise to this litigation are complicated and confusing. A diagram depicting the chain of title is set out below in order to facilitate an understanding of the nature of the dispute.

1. Subsequent to the filing of this lawsuit, but prior to trial, Frost quitclaimed whatever interest he had in the property to Omta. Subsequent to the filing of this appeal, but prior to oral argument, Omta died, and his personal representative was substituted for him as a party to the appeal. However, for the sake of simplicity, this opinion will refer simply to Omta, although the transactions were undertaken by both Frost and Omta and Omta's personal representative is actually the appellant.

CHAIN OF TITLE DIAGRAM

138

The first conveyance relevant to the issues in this case of the property which is the subject of this suit occurred in 1970 when Earl Powell, Inc. transferred the land to the Gennittis by a real estate contract (the Powell contract). The contract called for annual payments over a ten-year period. In June 1972 the Gennittis mortgaged the property to the Meneghins, and in January 1973 the Gennittis transferred their interest under the Powell contract to Pecos Land and Cattle Corporation.

In July 1973 Pecos executed a real estate contract by which the land was transferred to Robert J. Toomey (the Toomey contract). Toomey agreed to assume the payments to be made under the Powell contract, and, in addition, agreed to pay $503,000 in six consecutive annual installments of $50,000 each for the first five years, with the remainder to be paid in the sixth year. Toomey also agreed to pay the sum of $75,000 within sixty days of the date of the closing of the transaction.

On December 12, 1973 Pecos, as purchaser, entered into an agreement with Omta, as seller, for the purchase of all of the stock of Omta in a Hawaiian corporation, Orchid Island Hotels, Inc. (the Hotel contract). The Hotel contract called for a cash down payment in the amount of $603,000. In satisfaction of the down payment on the Hotel contract, Pecos assigned to Omta its right to the $75,000 then due Pecos under the Toomey contract. In addition, Pecos delivered a ninety-day promissory note for $25,000, and agreed to pay $503,000 on January 2, 1974.

By a letter agreement dated December 12, 1973, Pecos and Omta agreed that the $503,000 payment due on January 2, 1974 could be satisfied by Pecos' assignment to Omta of its interest in the Toomey contract. An assignment of Pecos' interest in the Toomey contract was executed by Pecos in favor of Omta on January 8, 1974.

On August 8, 1974 Pecos and Omta executed a promissory note and collateral agreement for the sum of $503,000 secured by an agreement which was labeled "conditional assignment." This "conditional assignment" contained the following paragraph:

This conditional assignment supercedes any previous agreement between the parties regarding the said agreement attached as Exhibit "2" to the December 12, 1973 Purchase Agreement between the parties.

Exhibit 2 to the December 12, 1973 Purchase Agreement was the Pecos-Toomey contract of July 1973.

A separately numbered paragraph in the "conditional assignment" provided that the assignment would become effective upon the election of the assignees (Omta and Frost) to take Pecos' rights under the Toomey contract, and written notice of the election to Pecos. Omta did not give such notice until approximately six months after Toomey defaulted on his contract. In the meantime, upon Toomey's default in October 1974, the property was reconveyed from Toomey to Pecos. In December 1974 Pecos executed and delivered a mortgage note in favor of the Ortega law firm.

On January 30, 1975 Pecos sold the property to the Puerto de Luna limited partnership. On that same date Omta and Pecos agreed on an assignment of a portion of the proceeds of that contract from Pecos to Omta, and conditionally agreed to an assignment of the remainder of the proceeds. A full assignment of this contract was never executed. Puerto de Luna defaulted, and the property was reconveyed to Pecos in October 1975.

On January 9, 1976 Pecos and Omta agreed that Pecos would convey the property to Omta in return for $15,000 and Omta's promise to take the property subject to the Ortega mortgage of December 1974. Omta expressly agreed to make the payments on the Powell contract, one of which had been due on January 6, 1976. Omta did not

make the Powell payment. The trial court found that by this breach of the agreement, Omta lost all his interest in the property.

In order to preserve their interest in the land, Pecos and the Meneghins entered into an agreement on February 6, 1976 under which the Meneghins agreed to make the Powell payments, and Pecos agreed to convey the property to the Meneghins, which it did in late February 1976 by a special warranty deed.

Omta argues several issues on appeal. We address the following questions: (1) Whether the trial court had jurisdiction in a mortgage foreclosure action over a counterclaim and cross-claim to quiet title; (2) whether the Ortega law firm and the Meneghins had standing to seek cancellation of the January 9, 1976 quitclaim deed from Pecos to Omta; (3) whether the Meneghins or Omta had superior title to the property; and (4) whether Omta and Frost acted as partners.

I.

Notwithstanding the fact that he requested the same relief, Omta contends that the trial court did not have jurisdiction to entertain the Meneghins' counterclaim and cross-claim to quiet title. He cites *Clark v. Primus,* 62 N.M. 259, 308 P.2d 584 (1957) and *Jackson v. Hartley,* 90 N.M. 428, 564 P.2d 992 (1977) for the proposition that counterclaims may not be asserted in actions to quiet title. Omta argues that counterclaims and cross-claims to quiet title cannot be asserted in other statutory actions, such as in an action to foreclose a mortgage.

In *Clark* the plaintiff sued to quiet title to certain property. The trial court dismissed the defendant's counterclaims which sought an accounting for the rents and profits received from the premises. This Court held that the counterclaims were properly dismissed because "counterclaims are not within the purview of the quiet title statute, § 22–14–1, N.M.S.A.1953 Compila-

tion. [§ 42–6–1, N.M.S.A.1978]. (Citations omitted.)" 62 N.M. at 263, 308 P.2d at 586.

The *Clark* decision was followed in *Jackson.* In *Jackson* this Court held that a counterclaim for ejectment could not be asserted in a suit to quiet title.

Neither *Clark* nor *Jackson* referred to this Court's decision in *Martinez v. Mundy,* 61 N.M. 87, 295 P.2d 209 (1956), in which a counterclaim to quiet title was permitted to be asserted in an ejectment action. In *Martinez* this Court stated:

> The plaintiff had the right to bring this suit in ejectment and to request a prayer for relief and the defendant had the right to come in with the counterclaim for remedy in the nature of a suit to quiet title. This is in accordance with the familiar rule that when a court of chancery obtains jurisdiction of a cause, it will retain it to administer full relief. (Citation omitted.)

61 N.M. at 96, 295 P.2d at 215. *Martinez* was followed in *Bailey v. Barranca,* 83 N.M. 90, 488 P.2d 725 (1971).

The law in New Mexico is obviously confusing in light of these four decisions by this Court. These cases indicate that a counterclaim to quiet title can be raised in an ejectment action (*Martinez*), but a counterclaim for ejectment cannot be raised in a quiet title action (*Jackson*). As one commentator stated:

> [W]hether or not two actions, one of which involves a suit to quiet title, can be determined in a single proceeding in New Mexico may depend upon the wholly coincidental factor of which party first commences litigation. (Footnote omitted.)

J. Walden, "The 'New Rules' in New Mexico," 25 F.R.D. 107, 121 (1960). Such a distinction is untenable.

Nowhere in *Clark* or the cases following it was any justification set forth for the principle announced therein. *Jackson, supra; Lanehart v. Rabb,* 63 N.M. 359, 320 P.2d 374 (1957). In addition, in the *Clark*

line of cases, this Court never attempted to reconcile its holdings with the New Mexico Rules of Civil Procedure.

The applicable rule in this regard is N.M. R.Civ.P. 1, N.M.S.A.1978:

These rules govern the procedure in the district courts of New Mexico in all suits of a civil nature whether cognizable as cases at law or in equity, except in special statutory and summary proceedings *where existing rules are inconsistent herewith.* (Emphasis added.)

*Clark* and its progeny ignore the critical inquiry under N.M.R.Civ.P. 1: Whether the statutory rules for proceedings to quiet title are inconsistent with the applicable rules with respect to the assertion of counterclaims and cross-claims in civil actions, N.M. R.Civ.P. 13, N.M.S.A.1978. As Professor Walden stated: "A careful reading of the quieting title statute * * * reveals nothing specifically nor inherently at variance with the unrestrictive counterclaim provisions of Rule 13." 25 F.R.D. at 120, (footnotes omitted). To the contrary, the language of § 42–6–1, N.M.S.A.1978 is consistent with the application of Rule 13 in this case. That statute provides that a claim to quiet title may be brought by a mortgage holder in an action to foreclose a mortgage. The statute contemplates the trial of both a foreclosure action and a quiet title claim in a single proceeding. It would be logically inconsistent to hold that it is permissible to try both claims in one proceeding if both are asserted by the plaintiff, but it is not permissible to join them in one case if one is asserted by the plaintiff and the other arises in a defendant's counterclaim or cross-claim. *See* Walden, note 53, 25 F.R.D. at 121–22.

This incongruous holding would also be contrary to the purpose of Rule 13. In *Scott v. United States,* 354 F.2d 292, 173 Ct.Cl. 650 (1965), the court said with respect to identical portions of Rule 13 of the Federal Rules of Civil Procedure:

The overriding emphasis is on consolidation and the expeditious resolution (where that is fair) of all the claims between the parties in one proceeding. * * The controlling philosophy is that, so far as fairness and convenience permit, the various parties should be allowed and encouraged to resolve all their pending disputes within the bounds of the one litigation. (Footnote omitted.)

*Id.* at 300.

The Meneghins' counterclaim and cross-claim clearly could have been raised under Rule 13. Rule 13(a) provides that a party *must* state as a counterclaim all claims arising out of the same transaction or occurrence giving rise to his opponent's claim. Rule 13(b) provides that a party *may* state as a counterclaim *any* other claim against an opposing party. Regardless of whether the Meneghins' counterclaim against Ortega is considered to arise from the same transaction or occurrence as the Ortega mortgage foreclosure action, there can be no doubt that the counterclaim could have been raised under Rule 13.

The cross-claim against Omta was also proper under Rule 13. Rule 13(g) provides that a cross-claim may state:

any claim by one party against a coparty arising out of the transaction or occurrence that is the subject matter either of the original action or of a counterclaim therein or *relating to any property that is the subject matter of the original action.* (Emphasis added.)

The Meneghins' cross-claim clearly related to the property which was the subject of the foreclosure action.

It should be noted that N.M.R.Civ.P. 20(b) and 42, N.M.S.A.1978 provide adequate safeguards to protect against any inconvenience or undue complication which might arise from joinder of claims under Rule 13. In light of these provisions, no purpose is served by continued adherence to the *Clark* rule. *See* Walden, 25 F.R.D. at 120.

■ We expressly overrule the principle established in *Clark* and the cases which have relied on it. We hold that in determining whether a counterclaim or cross-

claim may be brought in a quiet title action, or whether a counterclaim or cross-claim to quiet title may be brought in any other action, the proper analysis is that provided in Rules 1, 13, 20(b) and 42. Applying those rules to the facts of this case, it is evident that the trial court did not err in hearing the Meneghins' counterclaim and cross-claim in the mortgage foreclosure action.

## II.

Omta contends that neither Ortega nor the Meneghins had standing to seek cancellation of the January 9, 1976 quitclaim deed from Pecos to Omta. Omta makes several arguments to support this contention: (1) Cancellation of a deed cannot be sought in a suit to foreclose a mortgage; (2) neither Ortega nor the Meneghins were parties to the agreement pursuant to which the quitclaim deed was conveyed, and only a party is entitled to seek its cancellation; and (3) neither Ortega nor the Meneghins had a claim to the property superior to that of Omta's.

We need not address the first issue. Under Point I we held that a counterclaim to quiet title can be pled in an action to foreclose a mortgage. It is well settled that a deed may be cancelled in an action to quiet title to the property which the deed embraces. 12 C.J.S. *Cancellation of Instruments*, § 16 (1938). Pecos' January 9 quitclaim deed to Omta clearly placed a cloud on the Meneghins' asserted title.

Omta's contention that only a party to a transaction may seek its cancellation is also without merit. Although the Meneghins were not parties to the January 9, 1976 contract and deed between Omta and Pecos, their purported title was derived from Pecos. "[A] conveyance of property carries with it the incidental right of the grantee to maintain a suit in equity to set aside the voidable title of a third person. (Citations omitted.)" *Regnier v. Lay,* 21 Ill.2d 177, 171 N.E.2d 629, 630 (1961). *See also Lockhart v. Garner,* 156 Tex. 580, 298 S.W.2d 108 (1957).

Omta's third argument is that the Meneghins are strangers to the title of this property, and as such have no standing to challenge the quitclaim deed to Omta. This contention requires an examination of the respective claims to title of Omta and the Meneghins.

## III.

The trial court found that Omta had lost all his interest in the property. The court found that the Meneghins had title to the property by virtue of the February 1976 special warranty deed from Pecos, but that the Meneghins' interest was subject to the December 1974 mortgage to the Ortega law firm and to the 1970 Powell real estate contract. Omta challenges these findings. He contends that he has title to the property free from the claims of both the Ortega law firm and the Meneghins.

Omta first contends that he had superior title to the property as a result of the January 8, 1974 assignment by Pecos of the Toomey contract. He argues that he and Frost never directly reassigned their interest under this agreement to Pecos. This claim is without merit.

The August 8, 1974 agreement was labeled "conditional assignment." Paragraph 2 of that agreement expressly revoked "any previous agreement" between the parties with respect to the Toomey contract. This language included the January 8, 1974 assignment of the Toomey contract. Furthermore, the assignment provided that any rights Omta had to the Toomey contract were conditional upon written notice to Pecos of an election. Omta never gave timely notice. Therefore, as of December 1974 Omta had no interest in the property by virtue of either the January 1974 assignment or the August 1974 conditional assignment.

Omta next contends that the Pecos-Puerto de Luna contract of January 30, 1975 constituted a re-institution of the Toomey contract. Omta relies on two facts to support this contention: (1) Toomey was a general partner in the Puerto de Luna lim-

ited partnership; and (2) the Puerto de Luna contract incorporated by reference most of the terms of the Toomey contract.

Even if we assume that these two facts indicated that there was a re-institution of the Toomey contract, Omta's actions indicated that his understanding was precisely the opposite. On the same day that the Puerto de Luna real estate contract was executed, Omta and Pecos signed a letter agreement whereby Pecos assigned its right to $50,000 of the proceeds under the Puerto de Luna contract to Omta and Omta agreed to an assignment of the remainder of the proceeds if Ortega and the Meneghins released their claims against the property. If the Puerto de Luna contract had merely re-instituted the Toomey contract, this new assignment would have been unnecessary. By agreeing to an assignment of a portion of the proceeds and conditionally agreeing to an assignment of the remainder, Omta recognized the existence of a new agreement. Therefore, the trial court did not err in refusing to find that there had been a re-institution of the Toomey contract.

In October 1975 Puerto de Luna defaulted on the contract, and the property was once again reconveyed to Pecos. Thus, at the end of 1975, Omta no longer had any interest in the property.

Omta's final claim of title is the January 9, 1976 contract and quitclaim deed from Pecos. The trial court found that Omta's agreement on that date to make the delinquent payment on the Powell contract was a "material and substantial condition subsequent." Further, the trial court held that by his refusal and failure to make the payment on the Powell contract, Omta lost all his interest in the property. These findings are supported by the evidence.

■ Omta argues that the June 1972 mortgage on the property to the Meneghins and the December 1974 mortgage in favor of Ortega are invalid. This claim is also without merit. First, the Meneghins' claim rests not upon the 1972 mortgage, but upon the February 1976 special warranty deed from Pecos. Second, in the contract of January 9, 1976, Omta recognized the existence of the Ortega mortgage, and expressly agreed to take the property *subject to* this mortgage. Having done this, he will not now be heard to say that the mortgage was invalid.

■ In summary, the evidence supports the trial court's finding that Omta had lost all his interest in the property. He lost his original assignment of January 8, 1974 by executing the conditional assignment of August 8, 1974. He lost his interest in the conditional assignment by his failure to fulfill the condition. Finally, he lost the interest he acquired by the quitclaim deed when he failed to fulfill the condition required by his January 9, 1976 agreement with Pecos of making payments under the Powell contract. The trial court did not err in quieting title in the Meneghins.

### IV.

Omta also contends that the trial court erred in finding that he and Frost acted as partners with respect to the property transactions at issue in this case. There is no merit to this contention.

First, Omta makes no argument that this finding is in any way relevant to any other issue on appeal, or that a contrary finding would in any way affect the outcome of this case.

■ Second, assuming that the partnership issue is material, it need only be noted that the pre-trial order listed the existence of a partnership between Frost and Omta as the sole uncontroverted fact in this case. Although Omta's counsel objected to other portions of the pre-trial order, he made no reference to this item. The principle is well established that a pre-trial order, made and entered without objection, and to which no motion to modify has been made, "controls the subsequent course of the action." N.M. R.Civ.P. 16, N.M.S.A.1978. *See also Transwestern Pipe Line Company v. Yandell*, 69 N.M. 448, 367 P.2d 938 (1961); *Johnson v. Citizens Casualty Company of New York*, 63 N.M. 460, 321 P.2d 640 (1958).

■ Omta argues that although the pre-trial order provided that Omta and Frost were partners, the evidence at trial showed that they were not. Because the question of a partnership was not an issue at trial, the evidence Omta presented on the question was immaterial.

In light of the disposition we make of the foregoing issues, it is not necessary to consider the other issues raised by Omta.

There being no error in the findings of fact and conclusions of law of the trial court, its judgment is hereby affirmed.

IT IS SO ORDERED.

SOSA, C. J., and FEDERICI, J., concur.

EASLEY, J., not participating.